HARRY A. BOWERS, RESPONDENT, v. OTTIE MAY BOWERS, APPELLANT. —35 S. W. (2d) 39.

Kansas City Court of Appeals.   January 26, 1931.

*Horace G. Pope* for respondent.

*Wm. T. Johnson* and *Carlos W. Evans* for appellant.

ARNOLD, J.—This is a divorce suit.  The parties were married at Independence, Jackson county, Missouri, on September 16, 1908, and lived at Independence during nearly all of their married life. The husband filed his petition in the circuit court of Jackson county at Independence on May 22, 1926, alleging as grounds for divorce indignities consisting of the charges that defendant had abused and demeaned her husband; that she was jealous; frequently charged him with relations with other women; nagged and frequently applied to him vile and opprobious epithets, privately and in the presence of others, all without good excuse or provocation. On the 29th of

May, defendant filed answer and motion for alimony *pendente lite* and for attorney fees. It appears said motion was sustained and plaintiff was ordered to pay defendant $15 per week. Thereafter, on the 15th day of June, plaintiff moved to modify said order and to reduce or disallow alimony on the ground of plaintiff's illness and lack of income. On the 19th of June, following, this motion was overruled and on June 22, 1926, defendant filed her cross-bill in which she charged as ground for divorce numerous indignities, as follows: That plaintiff has been guilty of cruel and barbarous treatment such as to endanger her life and that plaintiff, without reasonable cause, has absented himself from defendant for the space of one year.

The cause reached trial on August 14, 1928, at Kansas City, having been removed from the Independence division of the circuit court on change of venue asked by defendant. Prior to the trial defendant moved to deny the introduction of evidence on behalf of plaintiff because he was in arrears in payment of allowances made for temporary support and maintenance of defendant and her children. The motion was denied, the cause proceeded to trail and thereafter the court took the case under advisement until September 24, 1928, at which time a purported decree was entered. Defendant appealed but upon consideration of the judgment entry, together with the order granting the appeal, as filed here, this court held we were precluded from a consideration of the errors assigned on appeal because there was no final judgment entered in the case, and there was shown no judgment from which an appeal would lie. Accordingly the appeal was dismissed.

Thereafter, by stipulation, the parties asked the order of dismissal be set aside and the cause considered on its merits, and at the same time furnished us with a certified copy of the decree as corrected by the trial judge *nunc pro tunc*, thus meeting the requirements under which the order dismissing the appeal was made. We, therefore, proceed to review the case on its merits.

The certifid copy of the judgment entry reads as follows:

"Now on this day comes plaintiff in person and by attorney and defendant in person and by her attorney, and the court now being fully advised, dismisses the answer and cross-petition of the defendant; and finds that the allegations in plaintiff's petition are true; that plaintiff is the innocent and injured party and entitled to the relief prayed.

"Wherefore, it is adjudged and decreed by the court that the bonds of matrimony heretofore contracted between plaintiff and defendant be and the same are hereby dissolved and for naught held and plaintiff forever freed from the obligations thereof."

It is further ordered and adjudged by the court that the cost herein be paid by defendant and that he have and recover same from defendant and have therefor execution."

A motion for a new trial was ineffective and defendant appealed. The errors assigned are (1) the court erred in allowing plaintiff to go to trial; (2) in granting a decree to plaintiff and (3) in admitting incompetent testimony. The first point urged in support of the appeal is the court erred in allowing plaintiff to go to trial in the case because he was in arrears in the payment for the sup-port of his family *pendente lite;* that plaintiff did not carry out the order of the court and had sought to defend his action by "either feigning or actually becoming sick." It is a matter of record that as soon as said order was made, plaintiff went to live with his sister at Bonner Springs, Kansas, where he remained for a year and four months. The record further shows that plaintiff and defendant separated on November 15, 1924, and plaintiff's suit for divorce was filed May 22, 1926. Plaintiff claims, and in this he is supported by evidence in his behalf, that from the time of their separation he paid defendant $15 per week until the divorce action was filed. There is some testimony tending to show that while he was ill at his sister's home, plaintiff borrowed $400 from his sister to pay his wife. This testimony, however, is not conclusive as there is some conflict in respect thereto.

The record shows defendant had plaintiff arrested for non-support during the time he claims to have been ill in Kansas. Upon a hearing in Jackson county, Missouri, the court held against him and the parole board ordered him to pay $60 per month and paroled him so he could go to work and earn the money. After October 31, 1927, plaintiff paid defendant at the rate of $60 per month. There appears to be some misunderstanding as to the purport of the ruling of the Independence division of the circuit court. Defendant seems to hold the position that Judge Hall, at Independence, allowed her $60 per month in addition to $15 per week voluntarily paid by plaintiff. The record does not support this view. The order was $15 per week for the support of the children and maintenance *pendente lite.* It is of record that when the cause came on for trial at Independence defendant filed her motion to stay proceedings until some payments she claimed were in arrears were made. The court overruled the motion, whereupon defendant took a change of venue. A similar motion was filed in the court at Kansas City where the cause was tried, and was overruled; the cause proceeded to trial, resulting in a divorce for plaintiff, as above indicated.

Defendant cites State ex rel. Dawson v. St. Louis Court of Appeals, 99 Mo. 216, in support of her position that the court was without right to permit plaintiff to proceed in the case, and urges that the motion to stay proceedings should have been sustained. In the Dawson case the court held the failure of the husband to pay alimony in extreme cases only will justify the court in striking his answer; but when he is plaintiff, his failure to obey such an order will

warrant dismissal of his case. Other cases cited by defendant are State v. Superior Court (Wash.), 148 Pac. 882, L. R. A. 1915E. 567; Peel v. Peel, 50 Ia. 521; Latham v Latham, 2 Swab & T. 299; Mangels v. Mangels, 6 Mo. App. 481. In the case last cited the court said:

"If the husband is plaintiff, and cannot furnish his wife with the means of defending his suit, he is not entitled to a decree. . . The court that makes the order can modify it during the pendency of the cause, if sufficient reasons appear for doing so. . ."

The case under consideration is somewhat different, as shown by the record, from those upon which defendant's position rests. Here, plaintiff's evidence shows that after the separation, he paid $15 per week for the support of defendant and the two minor children. His own testimony is that he borrowed $400 from his sister for that purpose, but defendant denies he paid her this amount. The evidence shows plaintiff was arrested for wife desertion, brought back from Kansas and placed in jail where he remained some months; that he was paroled by the proper authorities under orders to pay $60 per month for the support of his wife and boys. The record shows he complied with this order until the cause was tried, at which time payments ceased.

It appears defendant applies the rulings in the cases cited by her to the facts herein, but such application will not hold, for the reason defendant's position is that plaintiff may not proceed with the trial so long as he is in arrears on the payments, and not that he refused to make the payments, other than the arrears. It has been held repeatedly that in a divorce case the court may be called upon to decide questions in equity, though in this State a suit for divorce and alimony is one at law and not in equity. [Chapman v. Chapman, 269 Mo. 663, 672, 192 S. W. 448.] It was held in Coughlin v. Ehlert, 39 Mo. 285, that a judgment for alimony is simply an order for the payment of money. And this court held, in effect, in McMakin v. McMakin, 68 Mo. App. 57, that the fact that a judgment in a divorce proceeding for alimony *pendente lite* is not discharged according to the order of the court, does not authorize the striking out of the defendant's answer and a refusal to admit pertinent evidence offered by him. That opinion further holds a judgment for alimony is simply a judgment for the payment of money; that chancery rules depriving a party of his right of defense where he has put himself in contempt of court by the nonperformance of some specific act required of him by the court are not applicable in divorce proceedings. We hold the trial court did not abuse its discretion in overruling defendant's motion to deny the introduction of evidence.

It is urged the court erred in granting a decree to plaintiff. A discussion of this charge requires some reference to the evidence

presented. The evidence upon which plaintiff depends to support his cause tends to show defendant was possessed of a violent temper and was very quarrelsome, without cause; that she called plaintiff bad names and quarreled with the children calling them bad names in public; that she neglected her home and wifely duties and often when plaintiff would come home from work he would find the house locked and his supper unprepared; that at times he would have to wait until late in the evening to get into the house; and then defendant would quarrel with him and make life so miserable for him that he would have to go uptown to get away from her; and when he returned, she would keep him awake nearly all night fussing at him. One witness testified defendant told her she had made a mistake in marrying plaintiff; that she was in love with another man; defendant did not deny this; that she accused her husband of being a gambler and a "woman chaser." There was evidence in behalf of plaintiff that these charges were false, while on the other hand, there was evidence in defendant's behalf that these charges were true.

. Plaintiff insists that among other false charges of defendant against plaintiff was that after their separation and while plaintiff was living at Sheffield and was foreman in the bolt and nut plant there, he had women coming to his room. There was testimony in defendant's behalf that these charges were true. Plaintiff and his witnesses stated that, as foreman of said plant, he had many men and women under his direction and that the women calling at his room were always accompanied by children. That because of uncertainty of work they would come to his rooming place to see him to learn when they could go back to work. There was no proof that any improper conduct ever occurred.

The record shows the evidence took a wide range and much of it, doubtless, would have been excluded on proper objection, because not within the pleadings; but it went in without objection. The testimony showed that after the parties had separated, according to one witness, defendant permitted a negro man to come to her house and stay as long as three quarters of an hour, at times, while his delivery truck stood out in the street, and neighbors gossiped about this. The witness so testifying was one Hodkins, a deputy sheriff, sixty years of age. Defendant did not deny the negro had come into her house; that he delivered chicken feed at her order; stated she had known him from babyhood and he was then about thirty years of age; that he was so well acquainted with her that he addressed her by her first name of "Ottie." This is as far as the proof went. There was no proof of immoral conduct between them. Witness Hodkins testified he had admonished defendant about the negro's visits, and that neighbors were gossiping about it. At the trial defendant accused Hodkins of having made immoral advances to

her after his said warning. The trial court of its own motion called Sheriff Miles and asked him about the charges. The sheriff stated defendant had made such charges against Hodkins and against two others of his deputies. The sheriff had investigated the charges and refused to discharge the deputies therefor.

The evidence in plaintiff's behalf tends to how that after he filed this suit he was sick and unable to work for more than a year; that he was suffering from gall bladder trouble, lost much weight and was confined to his bed part of the time. Defendant had him arrested for non-support and on trial he was convicted and ordered to pay defendant $60 per month. He was also sentenced to jail. Defendant opposed his parole and stated she wanted him to "lie in jail and rot," but the parole was granted in order that plaintiff could go to work and earn money to pay defendant. And so the battle waged.

In support of her cross-bill, defendant's testimony is found to be as follows: She testified plaintiff stayed out nearly all night on some occasions and all night at other times, coming home the next morning in the laundry truck he was driving; that he gambled away his money, would no longer support his family and said he was going to have his "sweet mamas;" that he kept company with other women and flaunted the fact in the face of defendant; that he used vile and obscene langauge, cursed and otherwise abused defendant and threatened her life on several occasions; that generally he made life unbearable for her; that he left and deserted defendant without cause in winter and left her without food and heat; that plaintiff brought wine and whiskey to the house over her objections. As to the negro who came to her home defendant testified she would order feed from the grain company and this man would bring it, and once or twice he stopped and asked her for some matches; at another time he came in for a drink of water at the sink; that she had known him since he was a small boy. On cross-examination she was asked if, in the trial of the case she had called plaintiff's attorney "a dirty crook" and replied "If I did it would fit you." Asked if she did not receive money from plaintiff after September, 1925, her answer was, "I never received it then, no sir. He gave it to the children, $15 a week." Witness stated she never made any effort to become reconciled to plaintiff; that she never slept with plaintiff or was a wife to him from August until he left in November; that he came home drunk and awakened the neighbors with his cursing and abuse of her.

Testifying in behalf of defendant, Mrs. Teresa Ryan, a neighbor, testified that no gossip relative to the negro ever reached her until plaintiff came the previous winter and asked her to be a witness; that if there was an gossip she did not hear it; that she never heard any one say a word against defendant at that time; that Mr. Hodkins could see it (the visits of the negro) if it were true, as he

could see from the rear or side of his house; could not say if defendant ever stayed out late at night; she had seen plaintiff come home in the evenings from work and never saw any signs of abuse of defendant by plaintiff; never heard anything between them.

Mrs. Rachel Green, for defendant, testified she was an investigator for the Community Welfare Board; never met plaintiff until July, 1928; that he came to her at that time and asked her to investigate defendant and her actions with the negro and she refused; that plaintiff told her he had been sick with gall stones and had not been able to give defendant the money the court ordered.

Mrs. J. Wilson, for defendant, testified she managed a rooming house in Sheffield and plaintiff had a room at her house; that she had seen women go to his room, one of whom had a boy with her, ten or twelve years old; they came on Friday or Saturday evenings and then went over to the bolt and nut company plant and came back with him; that other women came there also. On cross-examination witness stated she did not know what the women came there for; that she never saw anything wrong in plaintiff's room; that the women generally took their children to plaintiff's room with them.

C. T. Stewart, for defendant, testified he lived near plaintiff and defendant; that defendant was a customer of his and her reputation was good; on cross-examination he stated he never knew anything about defendant's character and reputation.

Emery Bowers, son of the parties and a witness for defendant, testified plaintiff had cursed defendant "lots of times" and said he would kick her out; that he had "beat the kids;" never saw his father strike defendant; that when plaintiff left he said he would wash his hands of all of them and swore at defendant; that he heard his father say he would go get his "pretty brown-eyed mama;" that he thought his father meant he would get another mama for them and send defendant away; that he was about eight years old when he heard that; witness stated in Judge Kennedy's court that when his father tried to speak to him his mother would not permit it; that he felt bitter towards his father; once in a while he had heard his mother use violent language toward his father; that he and his brother often met their father up town to get the money; that he was with his brother a number of times when money was paid them to take to their mother; that he would sometimes write the receipts for the money so paid.

A. R. May, for defendant, testified he was the employer of the negro mentioned in the evidence; that the negro took orders of feed to defendant; that defendant's reputation was good.

Mrs. Flora Smith and Mildred Ward testified to the good reputation of defendant. There was some evidence in rebuttal introduced by plaintiff which was directed to a denial of defendant's testimony

which we need not here repeat. It is sufficient to say it was such as to require judgment as to the weight of the evidence at the hands of the trial court. The evidence is certainly conflicting and it was the duty of the trial court to weigh it and determine, if possible which, if either, side has presented a preponderance, or greater weight of the credible evidence. This is not always an easy or pleasant task. The court found plaintiff has sustained his cause and is the innocent and injuried party, and we are not prepared to say the court was wrong in his conclusions. We are convinced by a careful reading of the record that the decree rendered by the learned trial judge has the support or preponderating evidence and gives judicial expression to the real justice of the cause. And even though the evidence on either side does not greatly proponderate, the judgment of the trial court will not be interfered with. This court held in Thurmond v. Thurmond, 186 S. W. 1, as follows:

"The rule in this State with respect to the review in appellate courts of actions of this character is that, while the court is not bound by the findings of fact on which the judgment in question was predicated, but will read the record and weigh the evidence, yet the court will take into consideration the better opportunity of the trial judge to reach sound and just conclusions respecting the issues of fact which are sharply contested, and will not interfere with his findings where the evidentiary conflict is well sustained by both parties, and the conflicting testimony appears to be of equal force and plausibility. [Clark v. Clark, 143 Mo. App. 350, 128 S. W. 218; Hull v. Hull, 168 Mo. App. 220, 153 S. W. 531; Thiesen v. Thiesen, 167 Mo. App. 264, 149 S. W. 1174; Griesedieck v. Griesedieck, 56 Mo. App. 94.]"

Finally it is urged the court erred in admitting incompetent, improper, immaterial and irrelevant testimony. This charge refers to the receipt by the court of two letters from physicians in an attempt by plaintiff to prove he was actually sick when he went to Kansas. Defendant objected to their introduction, but they were marked and received by the court. Defendant insists that the physicians did not appear and testify as to plaintiff's true condition and that by reason of the admission in evidence of the letters, defendant was not accorded the privilege of cross-examination, to the prejudice of defendant's cause. We hold this objection to be without merit, because nowhere in the bill of exceptions, or elsewhere in the record, do these letters appear. The objection is not tenable.

For the reasons above stated, the judgment is affirmed. *Bland, J.,* concurs; *Trimble, P. J.,* absent.